ORIGINAL

Approved: _____
TIMOTHY V. CAPOZZI
Assistant United States Attorney

**18 MAG 2482**

Before:  THE HONORABLE BARBARA C. MOSES
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT FILED MAR 26 2018 S.D. OF N.Y. DS

------------------------------------x
                                    :
UNITED STATES OF AMERICA            :   SEALED COMPLAINT
                                    :
          - v. -                    :   Violations of
                                    :   18 U.S.C. §§ 1349,
ROBERT GUILIANO, and                :   1343 and 2.
RODIN DIAZ,                         :
                                    :   COUNTY OF OFFENSE:
                                    :   BRONX
          Defendants.               :
                                    :
------------------------------------x

STATE OF NEW YORK            ) ss:
SOUTHERN DISTRICT OF NEW YORK )

ELIZABETH GREANEY, being duly sworn, deposes and says that she is a Special Agent with the U.S. Department of Agriculture ("USDA"), and charges as follows:

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

1.  From at least in or about February 2013 up to and including the present, in the Southern District of New York and elsewhere, ROBERT GUILIANO and RODIN DIAZ, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.  It was a part and an object of the conspiracy that ROBERT GUILIANO and RODIN DIAZ, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and

1

television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Wire Fraud)

3. From in or about February 2013, up to and including the present, in the Southern District of New York and elsewhere, ROBERT GUILIANO and RODIN DIAZ, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, GUILIANO and DIAZ defrauded produce growers, shipping services providers, and others by transmitting, via wires, false and fraudulent information to obtain produce and shipping services on credit for which they never paid.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge of the foregoing charges are, in part, as follows:

4. I am a Special Agent with the USDA and have been so since 2011. I have been personally involved in the investigation of this matter. This affidavit is based on my personal observations and participation during the investigation, my conversations with other law enforcement officers and agents, my execution of search warrants and seizure of evidence, and my examination of evidence, documents, reports and other records. Because this affidavit is submitted for the limited purpose of establishing probable cause, it does not include all facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**RELEVANT ENTITIES**

5.     Based on my review of publicly-available corporate filings, I have learned the following, in substance and in part:

      a.    On or about March 18, 2013, Top Choice Produce Inc. ("Top Choice") filed as a corporation with the New York State Department of State ("NYS DOS"). Top Choice's address on file with the NYS DOS was an address on Pelham Road in New Rochelle, New York (the "Pelham Road Address").

      b.    On or about May 23, 2013, K & A Produce, Inc. ("K&A") filed as a corporation with NYS DOS. K&A's address on file with the NYS DOS was an address on Austin Place in the Bronx, New York (the "Austin Place Address"). RODIN DIAZ, the defendant, was listed as the Chief Executive Officer and Principal Executive Officer.

      c.    On or about July 15, 2015, KNA Produce Inc. ("KNA") filed as a corporation with NYS DOS. KNA's address on file with the NYS DOS was an address on LaSalle Avenue in the Bronx, New York (the "LaSalle Avenue Address"). An individual ("Individual-1") other than DIAZ and ROBERT GUILIANO, the defendant, was listed as the contact for NYS DOS process. Based on my review of law enforcement databases, Individual-1 resided at the LaSalle Avenue Address.

      d.    On or about September 8, 2015, Classic Produce Inc. ("Classic") filed as a corporation with NYS DOS. As of on or about December 14, 2016, Classic's address on file with the NYS DOS was the LaSalle Avenue Address. Individual-1 was listed as the contact for NYS DOS process.

      e.    On or about September 16, 2015, Vantage Produce Inc. ("Vantage") filed as a corporation with NYS DOS. Vantage's address on file with the NYS DOS was an address on Mace Avenue in the Bronx, New York (the "Mace Avenue Address"). GUILIANO was listed as the contact for NYS DOS process.

**RELEVANT ENTITY BANK ACCOUNTS**

6.     Based on my review of bank records, I have learned the following, in substance and in part:

      a.    On or about March 22, 2013, an account with an account number ending in 7907 was opened at TD Bank in the name of Top Choice ("Top Choice Account-1"). ROBERT GUILIANO and RODIN DIAZ, the defendants, were signatories on Top Choice

3

Account-1. DIAZ was removed as a signatory on or about October 1, 2013.

b. On or about March 28, 2013, an account with an account number ending in 0367 was opened at TD Bank in the name of Top Choice ("Top Choice Account-2"). GUILIANO was a signatory on Top Choice Account-2.

c. On or about October 2, 2014, an account with an account number ending in 1391 was opened at Citibank in the name of Top Choice ("Top Choice Account-3"). GUILIANO was a signatory on Top Choice Account-3.

d. On or about May 31, 2013, an account with an account number ending in 7361 was opened at Chase Bank in the name of K&A ("K&A Account-1"). On or about February 6, 2014, DIAZ became the sole signatory on K&A Account-1.

e. On or about July 21, 2015, an account with an account number ending in 0663 was opened at Alma Bank in the name of KNA ("KNA Account-1"). Individual-1 was a signatory on KNA Account-1.

f. On or about November 23, 2015, an account with an account number ending in 1902 was opened at TD Bank in the name of Classic ("Classic Account-1"). Individual-1 was a signatory on Classic Account-1.

g. On or about October 1, 2015, an account with an account number ending in 8850 was opened at TD Bank in the name of Vantage ("Vantage Account-1"). GUILIANO was a signatory on Vantage Account-1.

**OVERVIEW OF THE FRAUDULENT SCHEME**

7. From at least in or about February 2013 up to and including the present, the defendants participated in a scheme to defraud produce growers, shipping services providers, and others, using multiple corporate entities and fictitious names in order to obtain produce and shipping services on credit, for which the defendants did not pay. In particular, ROBERT GUILIANO and RODIN DIAZ, the defendants, represented that they were independent businessmen operating within the produce industry when, in fact, they were co-conspirators working together to defraud victims. In total, as a result of the defendants' scheme, victims lost in excess of $973,000.

**USDA RECORDS**

8.     Based on my training and experience, entities operating in the produce industry at the wholesale level, such as Top Choice, K&A, KNA, Classic, and Vantage, are generally required to be licensed under the Perishable Agricultural Commodities Act ("PACA").

9.     From my review of USDA records, I have learned the following, in substance and in part:

    a.     Top Choice, KNA, and Vantage appear to have never held a PACA license.

    b.     In or around July 2015, Top Choice was prohibited from operating in the produce industry due to an allegation that Top Choice failed to pay $102,938 for sweet potatoes received from a produce grower in North Carolina between on or about October 31, 2014 and on or about December 2, 2014. Correspondence between the produce grower and Top Choice signed by "Bobby G." listed as a return address the Austin Place Address, which was associated with RODIN DIAZ, the defendant, and K&A, see supra ¶ 5.b.  Due to the allegation, ROBERT GUILIANO, the defendant, was prohibited from being employed by or affiliated with any PACA licensee without prior USDA approval.  GUILIANO never obtained such approval.

    c.     As of March 21, 2018, three complaints against GUILIANO were pending with the USDA, including:

        i.     An allegation that GUILIANO, acting on behalf of Top Choice, failed to pay $18,526 for cabbage ordered between on or about January 7, 2015 and on or about January 17, 2015 from a produce grower located in Georgia.  An invoice from Top Choice to the produce grower listed the Austin Place Address, which was associated with DIAZ and K&A, see supra ¶ 5.b.

        ii.    An allegation that GUILIANO, acting on behalf of Vantage, failed to pay $59,500 for sweet potatoes ordered from a produce grower located in North Carolina.

        iii.   An allegation that GUILIANO, acting on behalf of Vantage, failed to pay $17,144 for apples ordered on or about September 18, 2015 from a produce grower located in North Carolina.

5

    d. K&A was a PACA licensee from in or about July 2013 to in or about April 2016, at which time its license was terminated due to K&A's alleged failure to pay $118,932 for produce received from five produce growers. K&A's PACA licensing application listed DIAZ as the contact for K&A. Due to the allegations, DIAZ was prohibited from being employed by or affiliated with any PACA licensee without prior USDA approval. DIAZ never obtained such approval.

    e. Classic became a PACA licensee in or about December 2015. Classic's PACA licensing application was signed by Individual-1. A phone number ending in 2711 ("Telephone Number-1"), which was used by DIAZ, see infra ¶ 13.c, 14.b, was listed as the contact number for Classic. The Austin Place address, which was associated with DIAZ and K&A, see supra ¶ 5.b, was listed as the mailing address for Classic. As of March 2018, three complaints against Classic were pending with the USDA, totaling $199,872.

## THE LISTING SERVICE

  10. Based on my communications with a representative from a service that, among other things, publishes listings of entities involved in the produce industry (the "Listing Service"), and my review of records from the Listing Service, I have learned the following, in substance and in part:

    a. In order to be listed in a particular reference publication published by the Listing Service (the "Reference Book"), which is used by participants in the produce industry to, among other things, assess potential counterparties to business agreements, a business must complete an application. The application requires that an applicant business, among other things, disclose the names of that business's principals and officers. In addition, the application requires disclosure of whether listed principals and officers were formerly financially interested in any business that failed to pay any indebtedness in full.

    b. In or about February 2014, K&A completed an application to be listed in the Reference Book. K&A's application listed RODIN DIAZ, the defendant, as the sole owner and president of K&A, and also listed Telephone Number-1 as the contact number for K&A. The application did not disclose any financial interest by DIAZ in any business that failed to pay any indebtedness in full. The application did not list ROBERT GUILIANO, the defendant.

6

c.  In or about January 2016, Classic completed an application to be listed in the Reference Book. Classic's application listed Telephone Number-1, which was used by DIAZ, see infra ¶ 13.c, 14.b, as the contact number for Classic. The application listed Individual-1 as the sole owner, principal, and officer of Classic. The application did not list GUILIANO or DIAZ. This application was false, in part, because, in fact, GUILIANO and DIAZ, not Individual-1, were the principals of Classic.

d.  In or around May 2017, an individual other than Individual-1 ("Individual-2") contacted the Listing Service and requested that the listing in the Reference Book for Classic be updated to include an individual named "Mac Johnson," with a phone number ending in 1585 ("Telephone Number-2"). In fact, it appears that no individual named "Mac Johnson" worked at Classic, see infra ¶ 17.b. In or around January 2018, Classic's listing was updated to exclude "Mac Johnson."

### INDIVIDUAL-1

11.  From my conversations with Individual-1, I have learned the following, in substance and in part:

a.  RODIN DIAZ, the defendant, asked Individual-1 to serve as the owner of Classic, explaining that he was unable to do so because of credit issues.

b.  DIAZ and ROBERT GUILIANO, the defendant, were business partners.

c.  At DIAZ's direction, Individaul-1 signed Classic's PACA licensing application.

d.  At DIAZ's direction, Individaul-1 signed checks on behalf of Classic. On other Classic checks, her signature was forged.

e.  Apart from signing checks and other documents on behalf of Classic and performing limited administrative work on a few days, for which DIAZ paid Individual-1 a total of approximately $10,000, Individual-1 performed no work for Classic.

7

## **VICTIMS**

12.  To date, the investigation has identified at least eight victims of the defendant's scheme, including the following.

### **Produce Grower-1**

13.  From my conversations with a New York City Police Department Detective ("NYPD Detective-1") who interviewed an employee of a produce grower located in North Carolina ("Produce Grower-1"), and my review of emails and other documents provided by Produce Grower-1, I have learned the following, in substance and in part:

    a.  In or around March 2015, ROBERT GUILIANO, the defendant, identifying himself as a representative of Top Choice, telephoned Produce Grower-1 and told Produce Grower-1 that he had seen boxes of produce in the New York area listing Produce Grower-1's name and telephone number. GUILIANO further indicated that he was interested in buying produce from Produce Grower-1.

    b.  GUILIANO completed and faxed to Produce Grower-1 a new customer application and a credit application for a business account (collectively, the "Application Materials"). Based on my review of the Application Materials:

        i.  GUILIANO listed as Top Choice's business addresses the Austin Place Address, which was associated in NYS DOS filings with K&A and RODIN DIAZ, the defendant, *see supra* ¶ 5.b, and the Pelham Road Address.

        ii.  GUILIANO listed "Jose" as an employee in Top Choice's accounts payable department. In Produce Grower-1's communications with Top Choice, Produce Grower-1 never spoke with any individual who identified himself as "Jose." In other words, Top Choice does not appear to have ever employed any individual named "Jose." That is, the Application Materials' representation regarding at least one Top Choice employee appears to have been false.

    c.  GUILIANO, via fax and via email, provided credit reference information to Produce Grower-1. Based on my review of the information, although DIAZ had been a signatory on a bank account for Top Choice, *see supra* ¶ 6.a, GUILIANO listed "Rodin" from "KNA Produce" as a "business/trade reference." GUILIANO listed Telephone Number-1 as the phone number for "Rodin."

8

    d. In or about April 2015, based in part on GUILIANO's representations in the Application Materials, Produce Grower-1 extended to Top Choice a $10,000 credit limit.

    e. In or about September 2015, GUILIANO began ordering sweet potatoes from Produce Grower-1.

    f. Initially, GUILIANO paid for the orders, paying $22,600 to Produce Grower-1.

    g. Produce Grower-1 continued to deliver sweet potatoes and to send invoices and monthly statements to Top Choice. Produce Grower-1 did not receive payment after on or about October 29, 2015. However, GUILIANO continued to accept shipments of sweet potatoes.

    h. On or about December 1, 2015 and after over ten emails, calls, and text messages from Produce Grower-1, GUILIANO promised via email to look into the past due invoices. This was the last email that Produce Grower-1 received from GUILIANO, despite repeated subsequent emails, calls, and text messages from Produce Grower-1.

    i. Produce Grower-1 provided GUILIANO $153,410 worth of sweet potatoes, for which GUILIANO did not pay.

### **Produce Grower-2**

  14. From my conversations with NYPD Detective-1, who interviewed an employee of a produce grower located in North Carolina ("Produce Grower-2"), I have learned the following, in substance and in part:

    a. In or around October 2015, ROBERT GUILIANO, the defendant, identifying himself as a representative of Vantage, telephoned Produce Grower-2 and told Produce Grower-2 that he had seen boxes of produce in the New York area listing Produce Grower-2's name and telephone number. GUILIANO further indicated that he was interested in buying produce from Produce Grower-2.

    b. GUILIANO listed K&A as a credit reference and RODIN DIAZ, the defendant, as the point of contact for K&A. GUILIANO listed Telephone Number-1 as the contact number for DIAZ. DIAZ provided Vantage and GUILIANO a favorable reference. However, based on my review of bank records for Vantage, Vantage had no financial transactions with, and did not extend credit to, K&A.

9

c. Between in or about October 2015 and in or about November 2015, based in part on the favorable reference from DIAZ, Produce Grower-2 provided GUILIANO $59,500 worth of produce, for which GUILIANO did not pay.

**Produce Grower-3**

15. From my conversations with NYPD Detective-1, who interviewed an employee of a produce grower located in Idaho ("Produce Grower-3"), I have learned the following, in substance and in part:

a. In or around September 2016, Produce Grower-3 contacted ROBERT GUILIANO, the defendant. GUILIANO told Produce Grower-3 that he worked for Classic.

b. Produce Grower-3 reviewed Classic's listing in the Reference Book and relied upon that listing, which was based on an application that was false in certain particulars, in deciding to conduct business with Classic.

c. GUILIANO used Telephone Number-2 to communicate with Produce Grower-3.

d. Produce Grower-3 provided Classic $20,483 worth of produce, for which Classic did not pay.

**Produce Grower-4**

16. From my conversations with NYPD Detective-1, who interviewed an employee of a produce grower located in Florida ("Produce Grower-4"), I have learned the following, in substance and in part:

a. In or around September 2017, Produce Grower-4 received a call from ROBERT GUILIANO, the defendant, regarding the potential purchase by GUILIANO of produce.

b. Produce Grower-4 reviewed Classic's listing in the Reference Book and relied upon that listing, which was based on an application that was false in certain particulars, in deciding to conduct business with Classic.

c. GUILIANO used Telephone Number-2 to communicate with Produce Grower-4.

d. Produce Grower-4 provided Classic $32,016 worth of produce, for which Classic did not pay.

### Produce Grower-5

17.  From my conversations with an employee of a produce grower located in California ("Produce Grower-5"), I have learned the following, in substance and in part:

   a.  Between in or around August 2017 and in or around November 2017, Classic purchased peppers from Produce Grower-5.

   b.  In negotiating these purchases, Produce Grower-5 communicated with someone who held himself out to be "Bobby 'Mac' Johnson." "Bobby 'Mac' Johnson" used Telephone Number-2, which was a number used by GUILIANO, see supra ¶ 16.c.  In fact, Classic does not appear to have ever employed any individual named "Bobby 'Mac' Johnson."

   c.  Produce Grower-5 provided Classic $98,308 worth of produce, for which Classic did not pay.

### Shipping Services Provider-1

18.  From my conversations with NYPD Detective-1, who interviewed an employee of a shipping services provider located in North Carolina ("Shipping Services Provider-1"), and my review of emails and other documents provided by Shipping Services Provider-1, I have learned the following, in substance and in part:

   a.  ROBERT GUILIANO, the defendant, hired Shipping Services Provider-1 to transport produce from growers throughout the United States to the New York City area and Connecticut.

   b.  On or about September 2, 2015, GUILIANO completed and signed a new customer set-up form for Top Choice with Shipping Services Provider-1. Based on my review of the form:

      i.  GUILIANO listed himself as President/Owner of Top Choice and listed "Doc Cruz" as an employee in Top Choice's Accounts Payable Department.

      ii.  GUILIANO listed the Austin Place Address, which was associated in NYS DOS filings with K&A and RODIN DIAZ, the defendant, see supra ¶ 5.b, as Top Choice's physical address.

      iii.  GUILIANO listed the Mace Avenue Address, which was associated in NYS DOS filings with Vantage, see supra ¶ 5.e, as Top Choice's billing address.

11

iv. GUILIANO listed the same telephone number ending in 7409 ("Telephone Number-3") for both Top Choice's business number and "Doc Cruz's" contact number. Based on my conversations with NYPD Detective-1, Shipping Services Provider-1 communicated with GUILIANO at Telephone Number-3 but not with any individual who identified himself as "Doc Cruz." In other words, Top Choice does not appear to have ever employed any individual named "Doc Cruz." That is, the new customer set-up form's representation regarding at least one Top Choice employee appears to have been false.

c. Between on or about September 28, 2015 and on or about February 24, 2016, Shipping Services Provider-1 provided shipping services to Top Choice.

d. During the time when Shipping Services Provider-1 was seeking payment from Top Choice for shipping services rendered, Shipping Services Provider-1 received a new customer set-up form from Vantage. Based on my review of the form:

i. The form listed Vantage Account-1, which was associated with GUILIANO, see supra ¶ 6.g.

ii. The form was purportedly completed and signed by "Robert Horford" as the President of Vantage. Based on my conversations with NYPD Detective-1, who interviewed victims, no victim recalled speaking with any individual who identified himself as "Robert Horford."

e. Shipping Services Provider-1 did not extend credit to Vantage and instead required up-front payment. Vantage paid Shipping Services Provider-1 a total of $29,973, using checks from Classic Account-1.

f. GUILIANO received from Shipping Services Provider-1 transportation services in the amount of $176,350, for which GUILIANO did not pay.

**Produce Broker-1**

19. From my conversations with NYPD Detective-1, who interviewed an employee of a produce broker located in Florida ("Produce Broker-1"), I have learned the following, in substance and in part:

a. In or around March 2014, Produce Broker-1 met ROBERT GUILIANO, the defendant. At the time, GUILIANO represented himself to be an employee of RODIN DIAZ, the

12

defendant, at K&A.  In or around November 2015, Produce Broker-1 stopped doing business with K&A after Produce Broker-1 entered into an agreement with K&A to accept partial payment for produce received by K&A.

      b.   In or around March 2016, GUILIANO contacted Produce Broker-1 and told Produce Broker-1 that GUILIANO had stopped working with DIAZ and had opened his own business, Top Choice, unrelated to DIAZ.

      c.   Produce Broker-1 entered into business with Top Choice and received payment of $20,000 from GUILIANO for an initial produce order.  Thereafter, Produce Broker-1 provided GUILIANO $77,420 worth of produce, for which GUILIANO did not pay.

### Produce Wholesaler-1

20.   From my conversations with NYPD Detective-1, who interviewed an employee of a produce wholesaler located in the Bronx, New York ("Produce Wholesaler-1"), I have learned the following, in substance and in part:

      a.   From at least in or around 2013 to in or around August 2016, Produce Wholesaler-1 purchased produce at a particular produce market (the "Produce Market") located in the Bronx, New York from ROBERT GUILIANO and RODIN DIAZ, the defendants, doing business as partners on behalf of Classic.

      b.   DIAZ handled sales on behalf of Classic.  GUILIANO handled ordering from produce growers on behalf of Classic.

      c.   Classic's prices were usually 20 to 30 percent lower than other produce sellers at the Produce Market, including the prices of farmers who sold produce directly to customers.

      d.   Produce Wholesaler-1 stopped purchasing produce from Classic in or around August 2016 because GUILIANO and DIAZ used Produce Wholesaler-1's name to enter at the toll plaza within the Produce Market, causing a loss to Produce Wholesaler-1 of approximately $1,500.

### PHONE RECORDS

21.   From my conversations with NYPD Detective-1, who reviewed phone records, I have learned that RODIN DIAZ and

ROBERT GUILIANO, the defendants, were in frequent contact with each other. In particular, I have learned the following, in substance and in part:

      a. Between in or about May 2015 and in or about May 2016, Telephone Number-1, which was associated with DIAZ, *see supra* ¶¶ 13.c, 14.b, communicated with Telephone Number-3, which was associated with GUILIANO, *see supra* ¶ 18.b.iv, 2,524 times.

      b. Between in or about May 2015 and in or about May 2016, Telephone Number-1, which was associated with DIAZ, *see supra* ¶¶ 13.c, 14.b, communicated 217 times with a telephone number ending in 4476 ("Telephone Number-4"). Based on my conversations with Produce Broker-1, GUILIANO used Telephone Number-4.

      c. Between in or about May 2015 and in or about May 2016, Telephone Number-1, which was associated with DIAZ, *see supra* ¶ 13.c, 14.b, communicated 5,096 times with a telephone number ending in 2355 ("Telephone Number-5"). Based on my conversations with Shipping Services Provider-1, GUILIANO used Telephone Number-5.

### BANK RECORDS

22. From my conversations with an analyst with the NYPD ("NYPD Analyst-1"), who reviewed bank records for accounts held by Top Choice, I have learned that both ROBERT GUILIANO and RODIN DIAZ, the defendants, received substantial proceeds from the scheme described above, in particular, I have learned the following, in substance and in part:

      a. Between on or about May 9, 2013 and on or about May 29, 2013, ROBERT GUILIANO and RODIN DIAZ, the defendants, made 12 withdrawals of more than $9,000 but less than or equal to $10,000 from Top Choice Account-1.

      b. On or about May 20, 2013, ROBERT GUILIANO, the defendant, made a withdrawal of $10,000 from Top Choice Account-2.

      c. Between on or about June 13, 2013 and on or about October 5, 2015, approximately six checks listing a payee of K&A and with a total value of approximately $16,163 were deposited into Top Choice Account-3.

  d. On or about October 5, 2015, a check listing a payee of Vantage and with a value of approximately $12,437 was deposited into Top Choice Account-3.

 23. From my conversations with NYPD Analyst-1, who reviewed bank records for accounts held by Classic, I have learned the following, in substance and in part:

  a. Between on or about February 1, 2016 and on or about October 14, 2016, GUILIANO was issued six checks totaling approximately $27,352 from Classic Account-1.

  b. Between on or about February 1, 2016 and on or about October 14, 2016, DIAZ was issued 12 checks totaling approximately $17,987 from Classic Account-1.

  c. On or about December 7, 2015, a check listing a payee of K&A was deposited into Classic Account-1.

  d. The handwriting on at least one check drawn on Classic Account-1 appears to match GUILIANO's handwriting.

  e. The handwriting on certain checks drawn on Classic Account-1 appears to match DIAZ's handwriting.

 24. From my conversations with NYPD Analyst-1, who reviewed bank records for accounts held by KNA, I have learned the following, in substance and in part:

  a. On or about August 8, 2015, Top Choice was issued a check for $2,675 from KNA Account-1.

 25. From my conversations with NYPD Analyst-1, who reviewed bank records for accounts held by K&A, I have learned the following, in substance and in part:

  a. Between on or about July 21, 2013 and on or about July 28, 2015, GUILIANO was issued approximately 28 checks totaling approximately $113,107 from K&A Account-1.

  b. Between on or about September 11, 2013 and on or about July 15, 2015, Top Choice was issued approximately 36 checks totaling approximately $431,492.50 from K&A Account-1.

  c. The handwriting on certain checks drawn on K&A Account-1 and purportedly signed by RODIN DIAZ, the defendant, appeared to match GUILIANO's handwriting.

15

    d. Certain checks issued to K&A list GUILIANO's home address.

 WHEREFORE, deponent asks that a warrant be issued for the arrest of ROBERT GUILIANO and RODIN DIAZ, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

              _____
               Elizabeth Greaney
               Special Agent
               U.S. Department of Agriculture

Sworn to before me this
26 day of March, 2018.

_____
THE HON. BARBARA C. MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

16